```
 1                              THE UNITED STATES DISTRICT COURT
                                FOR THE DISTRICT OF NEW JERSEY
 2                              CIVIL ACTION NO. 09-0366 (FSH)
          - - - - - - - - - - - - - - - - - x
 3                                         :
          BOEHRINGER INGELHEIM INTERNATIONAL,
 4        GMBH and BOEHRINGER INGELHEIM      :       TRANSCRIPT
          PHARMACEUTICALS, INC.,            :
 5               Plaintiffs,                :          OF
                     -v-                    :       PROCEEDINGS
 6                                          :
          MYLAN PHARMACUETICALS, INC., and  :
 7        MYLAN, INC.,                      :
                                           :
 8               Defendants.               :
          - - - - - - - - - - - - - - - - - x
 9
                                 May 12, 2009
10                               Newark, New Jersey

11        B E F O R E:   HONORABLE FAITH S. HOCHBERG, U.S.D.J.

12        A P P E A R A N C E S:

13                       MC CARTER & ENGLISH, ESQS.,
                         BY:  WILLIAM HELLER, ESQ.,
14                       PAUL, HASTINGS, JANOFSKY & WALKER, ESQS.,
                         BY:  BRUCE M. WEXLER, ESQ.,
15                       Attorneys for the Plaintiff

16
                         SAIBER, LLC, ESQS.,
17                       BY:  ARNOLD B. CALMANN, ESQ.,
                         PERKINS, COIE, ESQS.,
18                       BY:  SHANNON M. BLOODWORTH, ESQ.,
                         Attorneys for the Defendant
19        ANYONE INTERESTED IN PURCHASING A COPY OF THIS TRANSCRIPT
          MAY CONTACT JOHN STONE 973 824-4483 - jkstoneage@verizon.net
20

21        _____
          Purusant to Section 753 Title 28 United States Code, the
22        following transcript is certified to be an accurate record
          taken stenographically in the above entitled proceedings.
23
          s/ John K. Stone
24        _____
          JOHN KEVIN STONE,
25        Official Court Reporter
```

```
 1                    THE CLERK:   The Court calls Boehringer versus

 2      Mylan.

 3                    THE COURT:   Good afternoon.

 4                    Just identify who will be arguing for each side,

 5      whoever is arguing.

 6                    MR. WEXLER:   Bruce Wexler from Paul Hastings for

 7      the plaintiffs.

 8                    THE COURT:   Bruce Wexler.   Okay.

 9                    You'll be doing the argument today?

10                    MR. WEXLER:   Yes, for the plaintiffs.

11                    THE COURT:   Okay.

12                    You want to introduce your colleagues?

13                    MR. WEXLER:   Bill Heller from McCarter, and Eric

14      Dittmann, colleague of mine in Paul Hastings.

15                    THE COURT:   All right.

16                    And who will be arguing for the defendant?

17                    MS. BLOODWORTH:   I will, Your Honor.

18                    Shannon Bloodworth from Perkins Coie.

19                    THE COURT:   Okay.

20                    Do you want to introduce --

21                    MS. BLOODWORTH:   Yes.   Mr. David Harth from Perkins

22      Coie and Arnold Calmann from Saiber.

23                    MR. CALMANN:   Afternoon, Your Honor.

24                    THE COURT:   Okay.

25                    Everyone can be seated.
```

1           I actually brought these down from the Judges'

2    lunch today, so you get them if you work something out that

3    makes sense here.  They're the courtesy of all the Judges,

4    since we all jointly chip in for them.

5           All right.  This is your chance to be heard both on

6    the application for a stay and on the motion to dismiss.  I

7    have not yet decided whether I will in fact decide the

8    motion to dismiss or not.  And I say that because, having

9    discussed this with Judge Shwartz, and having read the

10   papers, one of the questions that comes to mind, as I

11   understand how you've all graciously decided in the interest

12   of judicial economy you should not do discovery but in the

13   interest of judicial economy I should write an opinion that

14   may not ever need to be written.  And I, as Judge Shwartz

15   said, I asked them 10 times how does that make sense.  So

16   that's one of the questions.

17          But getting beyond that, I have a series of other

18   questions.  So first, let's start.

19          Has everybody -- can everybody verify they've done

20   all the possible research on the motion to dismiss in all

21   the various permutations in which this case may arise?  Has

22   everybody done it so nobody's going to ask me for more

23   briefing today?

24          MS. BLOODWORTH:  That's correct, Your Honor.

25          MR. WEXLER:  No, Your Honor, we won't ask for more

1    briefing.

2              THE COURT:  Okay.  Fair enough.

3              Second question of course is, what is the current

4    status of the matter pending before the Federal Circuit?

5              MR. WEXLER:  Your Honor, oral argument has been

6    scheduled for June 1st, which is less than three weeks from

7    now.

8              We have some other information that we wanted to

9    talk through today, we thought might be helpful to Your

10   Honor, in lieu of further briefing.

11             But I assume we'll get to that later.  But I'm

12   happy to raise that now if Your Honor would prefer.

13             THE COURT:  Well, if you want to say something, now

14   is your chance to say it.  So please do.

15             MR. WEXLER:  Okay.

16             Well, in terms of the Federal Circuit appeal, in

17   terms of the first action, the first action involved a claim

18   on a first ANDA for a drug product by Mylan.

19             THE COURT:  Wait a minute.  Is this your oral

20   argument or is this -- are you just bringing the additional

21   information --

22             MR. WEXLER:  There's some additional information

23   weaved through that I needed to raise with Your Honor today

24   that I wanted to talk through --

25             THE COURT:  So is this in terms of scheduling and

```
1          what may happen in the various permutations in the Federal

2          Circuit, is that what this is?

3                    MR. WEXLER:  Yes.

4                    THE COURT:  Okay.  Fair enough.

5                    Proceed.

6                    MR. WEXLER:  So in other words, the first action

7          -- should I --

8                    THE COURT:  You can be anywhere you'll be

9          comfortable.  The microphones will pick you up wherever you

10         are.

11                   MR. WEXLER:  Wherever, what Your Honor --

12                   THE COURT:  Doesn't make a difference.

13                   MR. WEXLER:  Okay.

14                   So in the first action the plaintiffs sued Mylan on

15         a patent for a particular ANDA product.

16                   THE COURT:  Correct.

17                   MR. WEXLER:  So that action was decided on double

18         patenting grounds.  That is now on appeal at the Federal

19         Circuit.

20                   THE COURT:  I've read all the papers, every single

21         word.

22                   MR. WEXLER:  All right.  Okay.

23                   So where I'm going with this, we were asked by

24         Judge Shwartz a couple of questions, and following those

25         questions there's two, I think at least two pieces of
```

1          information I'd like to bring to your attention.

2                   One is what we already brought to Judge Shwartz'

3          attention, but I'm not sure if it's of record here, which is

4          the median time to disposition.

5                   The Federal Circuit publishes statistics, we were

6          asked if we had any data on that.  The Federal Circuit on

7          their website at cfac.us.gov publishes statistics, and I

8          have a copy of the web page that we covered at the hearing

9          with Judge Shwartz, that shows that the median time to

10         disposition is approximately 12 months from docket.

11                  Now, the appeal was docketed at the end of October

12         '08.  So if you calculate 12 months from October '08, that

13         lands you right about October of '09, which would be the

14         median time to disposition by the Federal Circuit.

15                  THE COURT:   Hhmm-hmm.

16                  MR. WEXLER:   So the two pieces of data we have are

17         June 1, oral argument, and a median time disposition of

18         October 2009.

19                  THE COURT:   Fair enough.

20                  When I sat with them, they expect draft opinions

21         within 90 days, and ideally within 60.  And they stick to

22         it.  It's a very prompt circuit.

23                  MR. WEXLER:   And the other piece of information

24         that I have for Your Honor, is that we were asked a question

25         by Judge Shwartz, what would the case look like, in other

```
 1      words, if the Federal Circuit affirms, then obviously the
 2      affirmance means the patent is valid on de novo review, the
 3      case is essentially over here.
 4              THE COURT:  Is not essentially -- well, I have
 5      various questions of my own.
 6              MR. WEXLER:  All right.
 7              THE COURT:  So if they affirm --
 8              MR. WEXLER:  Yes.
 9              THE COURT:   -- this case is completely over.
10      Everyone agrees on that?
11              MR. WEXLER:  Yes.
12              MS. BLOODWORTH:  Yes, Your Honor.
13              THE COURT:  Okay.
14              If they reverse, can you both assert that there
15      will be no further discovery necessary to be done in this
16      case?
17              MR. WEXLER:  And in our view, and this is what I
18      wanted to raise with Your Honor, after we were asked that
19      question I went back and looked at some of the case law that
20      existed on that -- that scenario, what would happen if the
21      Federal Circuit reverses and finds that there is no double
22      patenting on de novo review, what would the case look like.
23              There is a case that I found, a Federal Circuit
24      opinion, that looks just like what this case would look
25      like.  And I thought it would be interesting to show Your
```

1      Honor a copy of the case.

2              I'll give it to opposing counsel.  I -- it's just

3      basically additional authority, legal authority, that might

4      be of interest to Your Honor.

5              MS. BLOODWORTH:  Your Honor, in our opinion this

6      case was over when the Delaware court obviously ruled the

7      patent was invalid.  And if this case is reversed, in our

8      opinion, that puts the ball back in Boehringer's court, and

9      we really feel like the place for that, for this case is to

10     be back in Delaware in front of Judge Farren.

11             THE COURT:  And we'll get there.  That's one of the

12     permutations we'll get to.  And I'm inclined to agree with

13     that.  But I wanted to give everybody a chance to be heard.

14             MR. WEXLER:  And so in the Roche v. Apotex case, if

15     I may hand it up to Your Honor --

16             THE COURT:  Yes, you may.

17             MS. BLOODWORTH:  And Your Honor, it was cited in

18     our case --

19             THE COURT:  There's so many certifications.  It's

20     hard to keep track of them all.

21             MR. WEXLER:  Two sets of collated --

22             THE COURT:  All right.

23             So I'm still waiting for an answer to my question.

24     The pending question is --

25             MR. WEXLER:  So -- yes.

```
 1                 THE COURT:    -- the pending question is, I just
 2       want to be sure you remember the question and you're
 3       answering.
 4                 MR. WEXLER:   The question is what will the case
 5       look like if the Federal Circuit reverses.
 6                 THE COURT:   No, the question is, can you both
 7       assert to me that if the Federal Circuit reverses there's no
 8       need for any further discovery here?
 9                 MR. WEXLER:   And our position is that there
10       shouldn't be, and there isn't, and the Roche -- Roche v.
11       Apotex -- Apotex case, in a section where you get a second
12       ANDA --
13                 THE COURT:   I'm not about to rule on it.   Your
14       position is there will be no need for further discovery.
15       And your position?
16                 MS. BLOODWORTH:   Our position is it -- depending
17       upon the ruling from the Federal Circuit, and its
18       parameters, there may be a need for a limited amount of
19       additional discovery, based on Boehringer's later filing of
20       the terminal disclaimer, which was not part of the Delaware
21       action.
22                 They filed a terminal disclaimer after the close of
23       evidence at the trial.   That issue is currently up on appeal
24       before the Federal Circuit.   So again, until I understand
25       the contours of the Federal Circuit's exact reversal, we may
```

1    need to make some adjustments to at that time.

2           THE COURT:  Can you anticipate, is that the only

3    open issue?  Is it possible to do that discovery now or are

4    you saying that that --

5           MS. BLOODWORTH:  It would be possible to do that

6    discovery now, Your Honor.  We would argue that that's very

7    burdensome, to put Mylan to the cost of that discovery on a

8    speculative decision by the Federal Circuit.

9           THE COURT:  Believe me, I share your sympathies,

10   but you're asking me to decide a case.

11          MS. BLOODWORTH:  Yes.

12          THE COURT:  I mean you have a whole -- you both

13   have hundreds of lawyers to help you.  I've got two.

14          MS. BLOODWORTH:  And our case, Your Honor, is quite

15   simply that we moved to dismiss so that we didn't have to be

16   subjected to such costly discovery.

17          THE COURT:  I understand that.

18          But understand that judicial economy usually means

19   less work for courts.

20          MS. BLOODWORTH:  Again, we believe --

21          THE COURT:  Not less discovery for clients.

22          MS. BLOODWORTH:   -- and the best place for such

23   discovery would be back in front of Judge Farren in the

24   District of Delaware.

25          THE COURT:  Well, how about a ruling or an

1        agreement that says if there is a reversal, both sides agree

2        to transfer this case to Delaware where there would be an

3        open case to take it?  Is there any impediment?  Is venue

4        good in Delaware?

5                    MS. BLOODWORTH:  We would be fine with that, Your

6        Honor.

7                    THE COURT:  Is venue okay in Delaware?

8                    MR. WEXLER:  Yes.

9                    THE COURT:  Okay.  So that the only -- is that kind

10       of agreement forgible?

11                   MR. WEXLER:  I think so, Your Honor.

12                   The only caveat is if there's an outright reversal,

13       in our view the case is done in our favor.  So the only

14       contingency would be in some unusual situation --

15                   THE COURT:  In other words, if there's a reversal

16       and no remand --

17                   MR. WEXLER:  That's correct.

18                   THE COURT:  But you could still agree to transfer

19       it to him or her.  Is it a him?

20                   MS. BLOODWORTH:  Yes, Your Honor.

21                   THE COURT:  He could decide whether or not that's

22       true, having had a full hearing on the same patent.

23                   MR. WEXLER:  Yes, Your Honor.

24                   I mean either way is fine with us.

25                   In other words, if the court, Federal Circuit

```
 1          reverses, and directs that judgment be entered in our favor,

 2          it's ministerial whether this court enters it or Delaware.

 3          So if there's a transfer, it may just be easier --

 4                  THE COURT:  But she may not agree with you.

 5                  MR. WEXLER:  Right.

 6                  THE COURT:  So -- about whether it's ministerial to

 7          end it.

 8                  But you -- so I'm hearing that you're willing to

 9          agree that if there is a reversal by the Federal Circuit,

10          you're both in agreement that this case, in that event,

11          should be transferred to Delaware.

12                  MS. BLOODWORTH:  Yes, Your Honor.

13                  MR. WEXLER:  We would be willing to do that, yes,

14          Your Honor.

15                  THE COURT:  Okay.  All right.

16                  So then -- and that there would only be a very

17          limited amount of discovery.  About how long?

18                  MS. BLOODWORTH:  Your Honor, I --

19                  THE COURT:  You can't because you can't -- the last

20          time anybody -- the reason for my questioning is, you may or

21          may not have been involved in patent law at the time, it was

22          some number of years ago, I had -- I was new on the bench,

23          and I had a group of seasoned patent lawyers come to me and

24          say, you know, you need to stay Fuji versus Jazz, because

25          the issue's going to the Federal Circuit, and it's going to
```

1        decide all the issues, and it may obviate the need for a

2        case at all.  And even if it doesn't, it will be so clear

3        what's going to happen, we'll probably be able to meet

4        immediately and settle and it will be all over.

5              So I fell for it.  Huge mistake.  Three years

6        later, Fuji versus Jazz comes down, nobody agrees that it

7        disposes of the case, or even -- they can't even agree on

8        what it means.  And so we -- and discovery has not started.

9              So they did agree that they would be bound by the

10       discovery in the Court of International Trade, which was the

11       case that was up to the Federal Circuit.  They said they

12       presented the same issue as Fuji versus Jazz, they agreed to

13       that, so I said, fine, your discovery is done, so let's get

14       going with this trial.

15             It was going to be a long trial.  In fact, it was a

16       long trial.  And along comes the Court of International --

17       no, one of the International Trade offices of the Government

18       says, no -- no, no, they aren't allowed to make that

19       agreement.  Discovery has to start all over again.  I said

20       no, they made that agreement.  And it's a court order.  And

21       so discovery is done.  They're going to use the discovery

22       they used before the Court of International Trade.  And

23       the -- whoever it was, the General Counsel of the

24       International Trade Commission attempted a mandamus petition

25       on that issue.  Which then we had to wait for it to go up to

1    the circuit and get, you know, mandamus denied, and then we
2    could get started.
3           And all I'm saying is -- and then it was a three
4    month trial.  So nothing was saved by the stay.  Indeed, my
5    calendar was put into complete havoc by the stay.  That's
6    my -- the reason for my rather exigible questions.
7           MR. WEXLER:  And, Your Honor, I think that's the
8    co-pending application, I think I'm familiar with that case,
9    Fuji versus Jazz, but in this case --
10          THE COURT:  There are many Fuji -- I mean Fuji and
11   Jazz have a long and tortured history.
12          MR. WEXLER:  Yes.
13          But in this case, Your Honor, the issues on appeal
14   are discrete legal issues.  So the reason for the exception
15   for collateral --
16          THE COURT:  And they were too.  So that's why --
17   they were repair or reconstruction, straight legal issues.
18   The circuit would just hand it down and it would be all
19   settled.  Isn't what happened.
20          MR. WEXLER:  And, Your Honor, what we haven't
21   really heard is an articulation of what kinds of discovery
22   would be had in the case on remand.
23          Because if I could, for just a second, the issue on
24   appeal is whether this terminal disclaimer obviated double
25   patenting.  If the Federal Circuit rules that it did --

1    right, if the Federal Circuit rules it didn't, then it

2    affirms.  If the Federal Circuit rules that it obviates

3    double patenting, moots it, then the case is over.  There's

4    no need for discovery.  Because the case is over.

5            Now, if the Federal Circuit rules that the second

6    issue on appeal, pure legal one, is whether a statute

7    protects Boehringer against a double patenting defense, 35

8    U.S.C. 121, if the Federal Circuit finds that the statute

9    does protect, then again there's no remand or need for

10   discovery.  Because they've made a ruling on a statutory

11   interpretation.

12           And the last point, Your Honor, is in this Roche

13   case that I handed you, it holds that a defendant, a generic

14   defendant, in that case Apotex, who finishes a first case

15   and then there's a second case, they are barred by claim

16   preclusion after the appeal from raising any defense that

17   could have been raised in the first case.  So it can't

18   possibly be the situation that we're going to hear a whole

19   bunch of new defenses in this case.  And discovery --

20           THE COURT:  You're using issue preclusion against

21   them, they're using issue preclusion against you.

22           MR. WEXLER:  Right.

23           So what I'm saying is, the law is, because we have

24   a de novo issue on appeal, there's two pieces --

25           THE COURT:  Don't be so strong on how you're going

```
1       to end that sentence.  Why don't you rethink that sentence
2       in the interest of professionalism.  Let's start again.
3               MR. WEXLER:  Okay.
4               Because the issues are -- on appeal are purely de
5       novo issues, --
6               THE COURT:  It's not a de novo trial.  It's an
7       appeal of a legal issue that gets a de novo standard of
8       review.
9               MR. WEXLER:  And, Your Honor, I understand it's not
10      a trial de novo.
11              THE COURT:  That's the distinction.  It's not a
12      trial de novo.  So let's be clear on that.
13              And then finish your sentence about whatever the
14      law is.  Because I didn't find clear law on that in either
15      side's brief, despite you taking the one District Court case
16      you had and pushing it to the limits that one could push it
17      or more.
18              MR. WEXLER:  All right.
19              And I'd be happy to get into a discussion of the
20      law and try to go into more detail.  I'm obviously doing an
21      abbreviated discussion here.
22              THE COURT:  But -- no, no, say whatever you want.
23              MS. BLOODWORTH:  And, Your Honor, we would like to
24      respond to some of these points as well.
25              THE COURT:  You will.
```

1           MS. BLOODWORTH:  As to the timing issues

2      especially.  I can -- maybe I can address, since we seem to

3      be past those --

4           THE COURT:  Yes.  Let's -- fine.

5           MS. BLOODWORTH:  So the patent expires in October

6      2010.  So we will obviously not be here before Your Honor if

7      there is a stay, and we're obviously against any stay in

8      this issue, because there will be no more patent.

9           THE COURT:  I thought you agreed to a stay?

10          MS. BLOODWORTH:  We agreed to a stay of discovery

11     to prevent our client from going through the cost of

12     discovery while this motion to dismiss was pending.

13          THE COURT:  Oh.  I thought you agreed to a stay of

14     discovery until the circuit ruled?

15          MS. BLOODWORTH:  No, Your Honor.

16          We agreed to a motion -- we agreed to stay

17     discovery while this motion to dismiss was pending.  And

18     that was very clear in our correspondence.

19          And I understand that the order was maybe crafted,

20     you know, not exactly drafted quite clearly, but Mylan did

21     not agree to a stay of this action in toto.  We agreed to a

22     stay to save ourselves the cost of --

23          THE COURT:  Okay.  Then that's -- we never do

24     things sort of one-handed like that.  You either -- you

25     don't stay pending somebody else doing work.  Okay?

```
1     Especially when that else is a court.

2              MS. BLOODWORTH:  Right.

3              THE COURT:  Which has far fewer resources to do

4     work than you do.

5              So you were either seeking a stay of everything or

6     a -- seeking a stay of nothing, including getting discovery

7     ongoing.

8              MS. BLOODWORTH:  Mylan agreed to Boehringer's --

9     the parties agreed to stay discovery until this case, this

10    motion to dismiss was decided.

11             THE COURT:  Okay.

12             MS. BLOODWORTH:  And I didn't understand Your

13    Honor's --

14             THE COURT:  I'm not saying I don't agree with you,

15    you don't control the Court's calendar, I do.

16             MS. BLOODWORTH:  And -- right, Your Honor.

17             THE COURT:  Okay.  So that's off the table.

18             MS. BLOODWORTH:  Right.

19             THE COURT:  And so forget that agreement.

20             I'm not going to agree that both sides can get

21    together and decide, hey, we're going to save ourselves the

22    time, the work and money, but the court can keep going on

23    something that may be mooted by a Federal Circuit decision.

24    There's no way that's in the interest of judicial economy.

25             MS. BLOODWORTH:  I understand, Your Honor, and I
```

1     completely agree.

2              THE COURT:  All right.

3              MS. BLOODWORTH:  And we were trying to save not

4     just yours, but Magistrate Shwartz, the problem and the time

5     and expense incurred in overseeing discovery in this action,

6     when in our minds the patent is invalid.  Boehringer has

7     asserted no patent against us --

8              THE COURT:  I understand that.

9              Magistrate Judge Shwartz is not in agreement

10    either, that basically everybody's stopping but the court --

11             MS. BLOODWORTH:  Right.

12             THE COURT:  -- is not in the interest of judicial

13    economy.  I usually -- it's the other way around, the court

14    tries to not reach issues that it doesn't need to reach

15    unnecessarily.

16             MS. BLOODWORTH:  In the interest --

17             THE COURT:  If there's an issue one doesn't need to

18    reach in the interest of judicial economy, one doesn't reach

19    it.  But it doesn't mean the parties don't keep going with

20    their cases.  That's ordinarily how that concept and

21    doctrine works.

22             MS. BLOODWORTH:  And our motion to dismiss was

23    officially -- only brought for judicial economy.  We don't

24    see why there is patent litigation that is required in this

25    court at all.  This patent is held invalid, so --

```
 1              THE COURT:  It's -- okay.

 2              Let me ask you both this.

 3              Do you both agree, as you stand here today,

 4     regardless of what the circuit may do, if it rules tomorrow

 5     or next week, and there's a -- whether it's an affirmance or

 6     reversal, regardless of what it does, it doesn't affect the

 7     legal issues of issue preclusion that you briefed?

 8              MS. BLOODWORTH:  That's correct, Your Honor.

 9     That's Mylan's position.

10              MR. WEXLER:  I don't understand that position, Your

11     Honor.  The Federal Circuit's ruling, on their sole defense

12     that they took to trial, if the Federal Circuit reverses,

13     they're done.  If the Federal Circuit affirms --

14              THE COURT:  No, the issue is not what the -- what

15     the merits are, but the issue of issue preclusion.  Does the

16     law of issue preclusion change at all based on what the

17     circuit does?  That's my question.

18              MR. WEXLER:  Yes.

19              MS. BLOODWORTH:  No, Your Honor.

20              And the Court in Pharmacia v. Mylan addressed this

21     very question.  It's briefed and it's cited in our briefs.

22     We'd like to provide a copy for you, but it's on all fours

23     for exactly -- this case is exactly like what is now in

24     front of Your Honor.  There was a sister case where their

25     patent was found invalid and obvious, and the parties
```

1          brought another case in the District of Virginia against

2          Mylan.  Mylan argued collateral estoppel.  It went up to the

3          Federal Circuit and the Federal Circuit affirmed.

4                    And in this case, the sister companion case, in

5          post-trial briefing, it hadn't actually been appealed yet,

6          the Federal Circuit said, very clearly, it's invalid, the

7          District Court's judgment of invalidity is fine for claim

8          preclusion purposes.  It's to address very -- this very

9          situation that is occurring here today.

10                   THE COURT:  Okay.

11                   Do you have a response on that case?

12                   MR. WEXLER:  Yes.

13                   In the Pharmacia case, first of all, we heard a

14         piece of this, but in the Pharmacia case there was a finding

15         of invalidity for obviousness and network conduct.  On the

16         appeal of that issue, it was highly fact intensive, and the

17         Federal Circuit was going to apply a very deferential

18         standard of review, and if you look at the appeal of the

19         Pharmacia decision, Upjohn v. Mobil, 225 Fed. 136-06, you

20         can see the appeal of that underlying decision that was

21         highly fact intensive.  So it's different in that regard.

22                   THE COURT:  So wait a minute.  Tell me your answer

23         to my question then.

24                   MR. WEXLER:  Which was that whether or not this is

25         on all fours, the answer is no.

```
 1              THE COURT:  What does the law -- give me a cite for
 2    the proposition that the law of issue preclusion, whether
 3    you're precluded from raising an issue again if you've
 4    raised an issue in a previous case, whether issue -- the law
 5    or doctrine of issue preclusion is affected by whether the
 6    circuit reverses or affirms.
 7              MR. WEXLER:  Because the cite --
 8              THE COURT:  Is the answer yes or no?
 9              MR. WEXLER:  The issue preclusion, we submit, in
10    this case it attaches at the Federal Circuit ruling, not
11    before.
12              THE COURT:  You're saying there's no issue
13    preclusion at all?
14              MR. WEXLER:  Not at this time.
15              MS. BLOODWORTH:  That's incorrect, Your Honor.
16              THE COURT:  Okay.
17              What cite supports that?
18              MR. WEXLER:  The Moore case.
19              Now, I know, Your Honor, obviously I agree with
20    Your Honor, this is not area of law -- it's an usual
21    situation where the appeal involves purely legal issues.
22    But the Moore case that we cited to Your Honor --
23              THE COURT:  Is that the District Court case?
24              MR. WEXLER:  The District Court case.
25              THE COURT:  Do you have anything beyond Moore?
```

1            MR. WEXLER:  The Federal Circuit hasn't addressed

2     one way or the other the question, if you have an appeal

3     that concerns de novo review, essentially a do-over on the

4     issues that the Federal Circuit is reviewing --

5            THE COURT:  Stop calling it a do-over.  It's not a

6     do-over.

7            Let's be straight on the terminology we use.  I

8     understand the principle that you're raising, and I'm happy

9     to read any case you present to me.

10           But a de novo standard of review applied to a legal

11    determination by a District Judge is not a do-over of the

12    case in any way.  It's basically applying a non-deferential

13    standard of review.

14           MS. BLOODWORTH:  And, Your Honor, in the Pharmacia

15    case, that's exactly what was on appeal to the Federal

16    Circuit was an obvious de novo review.

17           THE COURT:  I understand that.

18           But then the question is why not wait and send all

19    this, when there is a case in Delaware to receive it, or

20    even transfer it to Delaware without a case there?

21           MS. BLOODWORTH:  Because while this action is

22    pending, what Boehringer has received is a 30 month stay of

23    Mylan's approval from the FDA.

24           THE COURT:  They got a second 30 --

25           MS. BLOODWORTH:  They got a second 30 month stay --

```
 1                    THE COURT:  I thought it was --
 2                    MS. BLOODWORTH:   -- because it's a .75 milligram
 3         as opposed to the four which were --
 4                    THE COURT:  When did the 30 month stay commence?
 5                    MS. BLOODWORTH:  Upon Boehringer's suit --
 6                    THE COURT:  Under the suit you got a second 30
 7         month --
 8                    MR. WEXLER:  Under the statute you get a second 30
 9         month stay.
10                    THE COURT:  I understand that under Hatch-Waxman
11         you got a 30 month stay --
12                    MR. WEXLER:  The answer is yes.
13                    MS. BLOODWORTH:  Yes, Your Honor.
14                    MR. WEXLER:  Under the statute, there is a second
15         dosage, there's a second 30 month stay for that ANDA.
16                    THE COURT:  How can you -- why are you agreeing to
17         any kind of stay?
18                    MS. BLOODWORTH:  All we agreed to was a stay of
19         discovery so we wouldn't have to incur any additional
20         expense.
21                    And I understand that was philosophically
22         incorrect, and we would take that back if we could.  We want
23         this case to be dismissed.  We are being highly prejudiced,
24         we have no ability to get final FDA approval while this case
25         is pending under Hatch-Waxman --
```

1              THE COURT:  Why is that?  What section --

2              MS. BLOODWORTH:  355(J)(5)(b)(4), Your Honor.

3      Because the case below, the Delaware action, in the Delaware

4      action, Boehringer was first filed, Boehringer has a 180 day

5      exclusivity on four of the strains of the product at issue.

6      Mylan has first to file exclusivity on the .75 milligram

7      product, which is at issue in this case.

8              THE COURT:  Hhmm-hmm.

9              MS. BLOODWORTH:  Because Boehringer has 180 day

10     exclusivity, the patent cannot be delisted until that 180

11     day exclusivity period has run.  So that when Mylan filed

12     its .75 ANDA, despite the fact that the patent had been held

13     invalid, we had to certify, with a paragraph 4 certificate

14     to the 812 patent.  That triggered the 25 day window, and

15     they brought suit alleging infringement of the very same

16     patent that was already held to be invalid.  And that's what

17     triggered another stay.

18             THE COURT:  Why didn't you sue in Delaware?

19             MR. WEXLER:  Because the purpose in this case --

20     first of all, I wasn't involved in the Delaware case, but

21     the main --

22             THE COURT:  I don't mean you personally, why didn't

23     your client sue in Delaware?

24             MR. WEXLER:  But because in this case what we were

25     really hoping to do was to see -- frame up the contentions

```
 1     right away that would tee-up a summary judgment once we got
 2     the Federal Circuit ruling.  And this Court has the early
 3     contention discovery which we set up with Judge Shwartz, a
 4     schedule where we could do the contention discovery right up
 5     front.
 6               THE COURT:  So you picked us because of our local
 7     patent rules --
 8               MR. WEXLER:  Local patent rules were conducive to
 9     either Court --
10               THE COURT:  Was the Delaware court case still
11     pending wherein that 45 day window to bring the suit?
12               MR. WEXLER:  No, the Delaware case was concluded,
13     we took the appeal and then the issue --
14               THE COURT:  Is -- is Boehringer now marketing?
15               MR. WEXLER:  No.
16               MS. BLOODWORTH:  Boehringer -- we settled with
17     Boehringer under a marketing agreement, they would be
18     marketing as early as June 1, 2010.
19               MR. WEXLER:  So Mylan  --
20               THE COURT:  Boehringer is marketing -- you entered,
21     basically entered into some financial arrangement with them
22     about the marketing?
23               MR. WEXLER:  Boehringer is not marketing,
24     Boehringer is going --
25               THE COURT:  Did you enter into a financial
```

```
 1          agreement with Boehringer about when they would go to
 2          market?
 3                  MR. WEXLER:   The settlement agreement provides when
 4          Boehringer could come into the market.
 5                  THE COURT:   How much did you pay them?
 6                  MR. WEXLER:   First of all, I wasn't involved, I
 7          can't say that anything was paid to Boehringer.
 8                  THE COURT:   Was anything paid?
 9                  MR. WEXLER:   The answer is I don't know.  And I'm
10          not about to -- I can't represent whether or not it was or
11          that it even was --
12                  THE COURT:   Is there anybody here that knows?
13                  A VOICE:   I'm the client, yes.
14                  THE COURT:   Yes.
15                  A VOICE:   The settlement agreement with Boehringer
16          allowed for an entry date for them to come in January 1st,
17          2010.
18                  THE COURT:   And what was done in exchange for that?
19                  A VOICE:   The -- in exchange for that we settled
20          the litigation.
21                  THE COURT:   Yes.
22                  A VOICE:   And the rest of the terms of settlement
23          are confidential.
24                  THE COURT:   Is there a financial payment to
25          Boehringer as part of it?
```

```
 1                 A VOICE:  Well, that would be confidential in the
 2     agreement.
 3                 THE COURT:  But I'm the Court asking a question.
 4                 A VOICE:  I understand.
 5                 THE COURT:  Do you want to submit the answer in
 6     camera?
 7                 A VOICE:  Let me --
 8                 MS. BLOODWORTH:  We would be fine with that, Your
 9     Honor.
10                 MR. WEXLER:  Your Honor, from Mylan's perspective,
11     seeing the agreement with Boehringer also is really
12     irrelevant to any of the issues that Mylan has in this case.
13     So if Your Honor is interested in the settlement agreement,
14     that's one thing.  But to give to the defendants --
15                 THE COURT:  I'm not saying I'm giving --
16                 MS. BLOODWORTH:  I just agreed to the in camera
17     review.
18                 THE COURT:  I said in camera.
19                 You can submit it in camera, I may or may not deem
20     that I even need to look at it.
21                 A VOICE:  Okay.
22                 THE COURT:  Just submit it so we can get off of
23     that topic.
24                 Okay.  So Boehringer will be marketing in about six
25     months.
```

1            MS. BLOODWORTH:  Yes, Your Honor.

2            THE COURT:  When did the 30 month period of the .75

3       milligram drug start?

4            MS. BLOODWORTH:  It started at approximately the

5       time this action started, so it will conclude after the

6       patent's expired.  So it will -- it will run from December

7       15th, 2010, it will run into the spring of 2011, Your Honor.

8            THE COURT:  What's the FDA position on whether you

9       can get final approval if there's an appeal pending?

10           MS. BLOODWORTH:  We can receive final approval if

11      there is an appeal pending if this case is dismissed.  If

12      there is an action here in the District Court, we cannot

13      receive final approval.

14           THE COURT:  And why is that?

15           MS. BLOODWORTH:  Because you cannot receive final

16      approval until there's a final decision of either invalidity

17      or non-infringement.  That's the only thing that will

18      terminate a 30 month stay at this point.

19           MR. WEXLER:  Your Honor, they don't -- Mylan  --

20      there's one fact that hasn't been brought to light, which is

21      Mylan doesn't have a tentative approval yet.  Which means

22      that even regardless of this case, the FDA hasn't approved

23      them from a scientific standpoint.  So that they can't go to

24      market irrespective of this case right now.

25           THE COURT:  Can -- when can they realisticly expect

1     to get a scientific approval?

2              MS. BLOODWORTH:  Your Honor, I can address that if

3     I may.

4              Typically, a good rule of thumb for first filed

5     applications is about a year.  Mylan's has been pending

6     almost that long.

7              We do have other approved strains that are

8     tentatively approved.  And I don't know how much of the

9     approval process you're aware of, but if Mylan did not have

10    the 30 month stay, we could automatically reach final

11    approval.  There's no internal tentative approval situation

12    at that point.  The only time you receive tentative approval

13    is if you are blocked by another applicant that is in your

14    way, there's a 30 month stay.  So at this point, if this

15    case continues and Mylan's application is approved, it will

16    only receive tentative approval.

17             THE COURT:  Why didn't you move to transfer to

18    Delaware where the judge knows the patent and everything

19    else?

20             MS. BLOODWORTH:  Frankly, it was time.  It would

21    have taken us a long time to transfer to Delaware, and then

22    we would have had to file our motion to dismiss again on the

23    same grounds we would be filing in this case here.

24             THE COURT:  What -- explain to me from a litigant's

25    perspective why it takes longer to transfer.

1           MS. BLOODWORTH:   We would have to file briefings,

2      I'm sure it would be opposed by plaintiffs.   Correct.   And

3      then Your Honor would have to approve it, and then we'd have

4      to refile in Delaware, and then we would bring a motion to

5      dismiss the Delaware action, which would then be another

6      round of briefing, and some more time and more money.

7           THE COURT:   So in other words, you're saying rather

8      than -- you couldn't file a motion to transfer and then --

9      oh, I see.   You're saying then it would get there and then

10     you'd have to file a motion to dismiss, so it would be

11     another briefing cycle at least.

12          MS. BLOODWORTH:   Yes, Your Honor.   At least, Your

13     Honor.

14          MR. WEXLER:   Your Honor, in this case there's a

15     reason in the 30 month stay as far as this particular ANDA.

16     Congress didn't provide that the 30 month stay disappears

17     for this ANDA because of another ruling for a different

18     ANDA.   So this ANDA gets the 30 month stay so we can resolve

19     the litigation for this particular ANDA.

20          THE COURT:   Is there anything different about this

21     particular strength that's at all material?

22          MR. WEXLER:   We would submit that for the purposes

23     of infringement, they stipulated to infringement in the

24     first action, that they should stipulate here that there's

25     no infringement difference with regard to the different

1    dosage strength.

2         THE COURT:  Why should two different courts decide

3    this patent?

4         MS. BLOODWORTH:  Well, Your Honor, that's why we

5    filed a motion to dismiss.  The patent is not specific to a

6    formulation.  It is specific to pramipexole.  All the claims

7    for pramipexole were held invalid or were not asserted in

8    Delaware, so therefore they are precluded from being

9    asserted here today.  There's nothing specific to Mylan's

10   strain .75 milligram that makes it unusual to the .125, .25

11   product.

12        MR. WEXLER:  Your Honor, on the .75, Mylan was able

13   to rely on Boehringer's information of the ANDA would not

14   exempt it from the clinical data, and its data for the

15   prospective pramipexole.  Mylan took advantage of

16   Hatch-Waxman and relied on their data and relied on an ANDA,

17   and Hatch-Waxman provides for the 30 month stay.

18        THE COURT:  I know.  Surely you've read all my

19   decisions about Hatch-Waxman going back to the dawn of time.

20        MR. WEXLER:  Yes, Your Honor.

21        And Judge Debevoise in the Cima decision was based

22   on a case against Apotex and a second 30 month stay, and he

23   still granted a stay so the Patent Office could reconsider

24   the reexamination of that patent.  So the 30 month stay,

25   while a factor, is not conclusive of the issue of the stay.

1    We have no tentative approval of this. And we would submit
2    that the 30 month stay --
3           THE COURT: Wait, I'm trying to understand your
4    argument a little bit. Go a little bit more slowly.
5           MR. WEXLER: Right.
6           THE COURT: What does the issue of the Patent
7    Office have to do -- is that distinguishing another case?
8           MR. WEXLER: In Cima Judge Debevoise stayed a
9    litigation, a Hatch-Waxman litigation, pending a
10   re-examination of the Patent Office of the patent.
11          So it would have been a case dispositive --
12   potentially case dispositive ruling by the Patent Office.
13   He stayed the decision. The defendant raised the 30 month
14   stay argument and Judge Debevoise weighed that fact and
15   found that judicial economy favored the stay.
16          Now, in this case we talk about the 30 month stay,
17   but what is -- what we're losing sight of is Congress didn't
18   provide that the 30 month stay disappears for this
19   particular ANDA because of what happened in another ANDA.
20          THE COURT: No, clearly the 30 month stay doesn't
21   disappear.
22          MR. WEXLER: Yes.
23          THE COURT: But how one deals with it, it's
24   certainly a factor. I mean I --
25          MR. WEXLER: And --

1          THE COURT:    -- just so you understand, at the very
2     beginning of this, you know, back even before some of these
3     rules were changed, I had a Hatch-Waxman case that preceded
4     the circuit in Apotex, where everybody was running in on the
5     inducement of infringement.  My first, very first, I think
6     it might have been the Organon case, I'm not a hundred
7     percent sure I remember which case it was.  And everybody
8     was just taking 30 months to decide.  And it occurred to me
9     that that just doesn't make sense, because there's no
10    provision in the statute for restitutional reimbursement if
11    you turn out to be wrong.
12          MR. WEXLER:  And Your Honor, in this case, we have
13    the statutory framework that has the quid pro quo built in.
14          THE COURT:  Correct.
15          MR. WEXLER:  We have the 30 month stay here.
16          THE COURT:  I totally understand the statutory
17    framework.  I understand everything.  The question that I'm
18    addressing, trying to understand, is issue preclusion.
19          MR. WEXLER:  Now --
20          MS. BLOODWORTH:  Right.
21          MR. WEXLER:   -- if we --
22          THE COURT:  How is it you can assert issue
23    preclusion against them in how the circuit may rule, but not
24    issue preclusion against yourself?
25          MR. WEXLER:  We're not asserting issue preclusion.

1          THE COURT:  You're -- in this transcript you were

2     handing up to me, there's a case saying they are issue

3     precluded.  What was that argument?

4          MR. WEXLER:  Your Honor, we were asked by Judge

5     Shwartz what will be -- what is the case going to look like

6     at the Federal Circuit ruling.  And that's what I'm talking

7     to Your Honor about.  That after the Federal Circuit ruling,

8     it's one way or the other.  That either there's going to be

9     affirmance, which will end the case one way, or a reversal,

10    which if you follow Roche, what happens in Roche, a reversal

11    will result in a claim preclusion argument by us, when the

12    case is done at the Federal Circuit level.

13         Now, in Roche the District Court stayed the

14    proceedings pending the Federal Circuit review.  And those

15    are the pieces of paper I gave behind there.  The District

16    Court stayed the second proceedings pending Federal Circuit

17    review, and after the Federal Circuit ruled the court set up

18    a quick schedule for a dispositive motion to end the case.

19         THE COURT:  The only problem I have with all that,

20    all of these stays, let this one decide, let that one

21    decide, essentially, is victory on the merits here.  If

22    indeed the 30 months ends into the run end of the patent,

23    that's the problem.  What looks like just a schedule issue

24    is in fact more fully on the merits, conceivably.  That's

25    the concern I have.  That's the reason I scheduled oral

```
 1    argument, to speak up or forever hold your peace.  Because I
 2    may just rule.
 3              MR. WEXLER:  And I understand Your Honor is very
 4    familiar --
 5              THE COURT:  Because it's not -- this 30 month stay
 6    is a very valuable commodity.  It's not just, okay, take
 7    your time, let's everyone be gentle people about this.
 8    That's not how this -- this is a -- a ruling on a stay
 9    affects merits here, and that's the concern I have.
10              MR. WEXLER:  The Congress imagined that the case
11    would be resolved within 30 months.
12              THE COURT:  Congress --
13              MR. WEXLER:  But this case will be resolved within
14    30 months, and the second point is, Your Honor --
15              THE COURT:  But 30 months takes you to the end of
16    your patent.  So they have no rights at all.
17              If you are wrong, then they -- you have blocked
18    them from selling a generic until your patent expires.  That
19    is a merits decision.  That's not just a timing decision.
20    That is essentially taking what could conceivably be a valid
21    cause of action and neutering it.
22              MR. WEXLER:  Your Honor, the Federal Circuit
23    decision, that's October of next year.
24              And by the way, that accepts that our terminal
25    disclaimer applies, which is their argument that it doesn't
```

1        apply, but the terminal disclaimer we filed says the

2        expiration to that date, which is part of the appeal, which

3        is what we argue moots the double-patenting to begin with.

4        So what I'm saying is October of next year is -- the Federal

5        Circuit is going to rule before October of next year.  I

6        mean we're expecting a decision October of this year.

7        October of this year.  October of 2010 is when they're

8        talking about the patent expiring.  We're right now only in

9        May of 2009.

10              THE COURT:  Hhmm-hmm.

11              MR. WEXLER:  So the median time to disposition, we

12       have argument in three weeks.  The median time to

13       disposition is going to be October of this year.  So they're

14       talking about another year after the median time and --

15              THE COURT:  I understand.

16              MR. WEXLER:   -- and if I --

17              THE COURT:  Time out.  Let's get back to issue

18       preclusion.

19              MS. BLOODWORTH:  Yes.  Yes.

20              THE COURT:  I want to talk about the law.

21              MS. BLOODWORTH:  Okay.

22              THE COURT:  Do you have a case in which a court

23       ruled that someone was issue precluded and based on

24       something that happened at the appellate stage that issue

25       preclusion ruling was declared incorrect, overturned,

1      reversed in some way because of a disposition on appeal?

2             MR. WEXLER:  We have the -- as Your Honor pointed

3      out, this area of the law is unusual.

4             But we have the case, there are two cases that

5      apply de novo exception, both issue preclusion and claim

6      preclusion applies equally in the Westinghouse case.  It's

7      an old case, the PTO found that this word reduced to

8      practice the invention but suppressed it.  It went up on

9      appeal to the commissioner, he upheld the suppression issue,

10     but never addressed reduction of practice.  The court said

11     quote, "there's no estoppel as to reduction of practice

12     because they have, the pendency of the appeal suspends here,

13     no doubt -- this is quote, "no doubt that appeal to the

14     reviewing tribunal that hears the matter de novo suspends

15     estoppel."  It's an old appeals case, but it applies to de

16     novo exception.

17            And we have the Moore case which is a District

18     Court squarely on point for issue preclusion, holding up and

19     providing it.  We have --

20            THE COURT:  Wasn't that a district court case

21     though where there was an actual trial de novo?

22            MR. WEXLER:  No.

23            THE COURT:  It was just a legal issue on appeal?

24            MR. WEXLER:  Claim preclusion.

25            The first case found claim preclusion, and granted

1        summary judgment.

2              The second case, the judge refused to apply

3        collateral estoppel on the issue of claim construction,

4        because the claim construction was up on appeal at the

5        Federal Circuit.

6              It's on all fours with the idea of a de novo review

7        of the legal issue.  And Wright and Miller says it's a

8        grotesque result to premise a dismissal, a substantive

9        dismissal on a ruling that's currently on appeal in this

10       case, and I understand Your Honor's position, but here it's

11       de novo review, that means without deference --

12             THE COURT:  That's what I said --

13             MR. WEXLER:  The Delaware Judge said that there's a

14       good record on both sides, and that the real answer is going

15       to come in Washington.

16             So we -- and I understand Your Honor's, that -- and

17       I'm fully familiar with de novo review, but we get de novo

18       review without deference, it's so grotesque a result to

19       permit a dismissal --

20             THE COURT:  How about issue preclusion here,

21       without prejudice to your right to present the issue to the

22       Delaware Judge immediately if there's reversal in the

23       Federal Circuit?

24             MS. BLOODWORTH:  Your Honor, before we move --

25             MR. WEXLER:  Your Honor --

1           MS. BLOODWORTH:  Can I please address Mr. Wexler's

2      points --

3           THE COURT:  Yes.

4           MS. BLOODWORTH:   -- which are, first of all,

5      completely confusing the issues of de novo review with a

6      full trial de novo.

7           The Federal Circuit in 2000 specifically ruled, and

8      I'm going to read the Pharmacia v. Mylan case, the quote,

9      "the law is well-settled that the pendency of an appeal has

10     no effect on the finality or binding effect of a trial

11     court's holding."

12          It is black letter law that they are precluded from

13     asserting this patent against Mylan right now.  They may not

14     like that result.  They may hope that the record proves to

15     be in their favor in the future.  They have other remedies

16     maybe then at that time they can take.

17          But the fact is right now they are precluded from

18     arguing this.  It's well-settled law it's not an exception.

19     It's in a Southern District of Ohio unpublished decision --

20          THE COURT:  If -- if you said the Federal Circuit

21     ruled two hours ago and reversed the Delaware decision two

22     hours ago, you're waiting for oral argument, so now you know

23     that it's been reversed.

24          MS. BLOODWORTH:  Yes, Your Honor.

25          THE COURT:  Same arguments on issue preclusion,

1     exactly the same arguments?

2              MS. BLOODWORTH:  Yes, Your Honor.  Exactly the
3     same.

4              Except for -- except at that point the Delaware
5     court would have to know the entry decision would come back
6     down and the Delaware court would go on the books as
7     reversed and, obviously, as Mr. Wexler argued in his papers,
8     he will be arguing about preclusion on the other side.
9     That's the impact of the finality of the judgment.

10             Right now the Delaware court entered final
11    judgment.  The 812 patent is invalid.  The Pharmacia case is
12    the de novo review of the obviousness determination of the
13    court's decision below.

14             MR. WEXLER:  Your Honor, I really would recommend
15    that Your Honor please review Pharmacia and the appeal.
16    Because it's a misstatement that the review in that case was
17    de novo.  It was an obviousness determination, an
18    unenforcability finding.  The appeal was fact sensitive, and
19    if you look at the Upjohn v. Mobil case, they denied, 225
20    Fed. 1306, you'll see that the appeal was heavily fact
21    intensive.  They cite the Merck decision and state that
22    obviousness is de novo.  Merck on the next page says, quote,
23    "obviousness is an issue of law based on underlying fact
24    determinations reviewed for clear error."  Pharmacia
25    involved a case where the appeal was heavily fact intensive,

1    first of all.  Second of all, the appeal hadn't even been
2    filed in Pharmacia.  As was alluded to, down the road months
3    from now they were going to file a JMOL.  So the JMOL would
4    come months later, the appeal would come in that case, the
5    court refused to -- I mean the court applied collateral
6    estoppel, went up on appeal, there was no discussion of the
7    de novo issue because it wasn't de novo review.

8              MS. BLOODWORTH:  Your Honor, that's exactly the
9    point.  The point is that the court affirmed a District
10   Court's dismissal or entry of collateral estoppel despite
11   the fact that a JMOL was still pending in the movants
12   decision, and despite the fact that it had then been
13   appealed during the collateral estoppel finding, so --

14             THE COURT:  I'm going to ask you both one last
15   chance to describe this to me.  And my hypothetical is, the
16   Federal Circuit ruled two hours ago and reversed the
17   District Court in Delaware.  Now, how, if at all, are the
18   issue preclusion arguments raised in your brief changed?

19             MR. WEXLER:  Your Honor, so --

20             THE COURT:  Wait a minute I'm addressing it to her,
21   then you'll have your chance.

22             MR. WEXLER:  I'm sorry.

23             THE COURT:  All right.

24             MS. BLOODWORTH:  Your Honor, we would argue that
25   until the actual order in the District Court was changed,

1       that final District Court order was changed, there would be

2       no impact to this case standing here today.  And to get to

3       your question, even if what the court concluded in Pharmacia

4       was quote, if another panel later concludes that one or more

5       of the juried verdicts in Pharmacia should be reopened,

6       Upjohn may then move the District Court to modify its

7       judgment accordingly.  They have relief that's available to

8       them other than prosecuting an action that's full of just

9       speculative claims at this point of the case.

10              THE COURT:  What would be their relief?

11              MS. BLOODWORTH:  They could file --

12              THE COURT:  Let's suppose I were to grant your

13      motion.

14              MS. BLOODWORTH:  Yes, Your Honor.

15              THE COURT:  And then tomorrow, tomorrow the Federal

16      Circuit reverses the Delaware District Judge.  What's their

17      relief?

18              MS. BLOODWORTH:  First of all, I think probably

19      they would seek relief in Delaware.

20              But second of all, they could always file a Rule

21      60(b) request.

22              THE COURT:  Well, they'd seek relief in Delaware of

23      the Delaware judgment.  The Delaware court wouldn't have

24      jurisdiction over this judgment.

25              MS. BLOODWORTH:  We've all agreed to venue in

1    Delaware, regardless.  The Delaware court could come and

2    wrap up all the ANDAs in one case in front of Judge Farren

3    at one time.

4            MR. WEXLER:  Judge, this is different.  Again, the

5    Federal Circuit would be within -- if we're going to have a

6    Federal Circuit reversal, we're going to have to reopen the

7    judgment, we're going to have an appeal on the collateral

8    estoppel issues, we're going to be briefing the issue of

9    whether this court properly applied collateral estoppel.

10           THE COURT:  You can do that.

11           MR. WEXLER:  All I'm saying, in terms of judicial

12   economy, we're now burdening the Federal Circuit with

13   another appeal.  If either the Federal Circuit reverses on

14   the collateral estoppel or underlying decision gets

15   reversed, we're back here trying to reopen the judgment at

16   that --

17           THE COURT:  No, you're in Delaware.  Trying -- the

18   presumptive premise is that at some later time the Delaware

19   court gets reversed and you've transferred it there.

20           MR. WEXLER:  The agreement was that we stay the

21   case, the Federal Circuit reverses, do we transfer to

22   Delaware, not this court dismisses and then we --

23           THE COURT:  Excuse me.  I've already made it very

24   clear, and I appreciate your worry about judicial economy

25   for the Federal Circuit.  I'm also worried about judicial

1          economy for the District Court and the Magistrate Judge and

2          judicial economy is judicial economy, doesn't matter which

3          court it is.

4                    MR. WEXLER:  And we're suggesting, Your Honor, to

5          write an opinion on collateral estoppel, on a debated issue

6          --

7                    THE COURT:  Are you willing to enter an agreement

8          that financially recompenses them for the period of time, if

9          I were to go with your argument for some settlement, for a

10         financial way of establishing what it is that you're

11         concerned about economy with, maybe today we can forge an

12         agreement about how many dollars you pay them to have

13         everybody just sit still and wait for the Federal Circuit.

14                   MR. WEXLER:  I mean I don't even -- I guess I could

15         think about how that would play out.

16                   THE COURT:  Well, do you want to take a short break

17         to do that?  I'm happy to go off the bench, I have some --

18         seriously, maybe there's some kind of way the two of you can

19         work something out.  A stay is not just preserving the

20         status quo.  A stay is a win for you.  Under the way the

21         Hatch-Waxman statute is used today.

22                   MR. WEXLER:  It's --

23                   THE COURT:  And therefore, I'm saying if you really

24         want to just preserve the status quo, avoid burdening

25         judicial economy, which I'm all in favor of, I mean avoid

1    burdening courts, then work something out that makes it

2    really fair to do so.

3                MR. WEXLER:  Your Honor, they don't have tentative

4    approval now.  So it's unclear what we're even --

5                THE COURT:  If you don't want to work something

6    out, you don't have to work something out.

7                What I'm saying is, let me get off the bench, why

8    don't you take 20, 30 minutes, discuss it with each other,

9    maybe when you're not under the pressure of answering a

10   court's questions there might be some creative way that you

11   can together work out a structure that is fair to one and

12   all while the circuit is considering the Delaware case.

13   That -- I mean maybe there isn't, maybe there is.  I have no

14   idea.

15               MR. WEXLER:  Yes.  I just -- I'm happy to talk

16   about it.  Seems unfair when we have the right that attaches

17   to this particular ANDA and a quid pro quo --

18               THE COURT:  You don't have the stronger part of the

19   argument on issue preclusion.

20               MS. BLOODWORTH:  And Hatch-Waxman did not mean to

21   supplant issue preclusion.

22               MR. WEXLER:  And --

23               THE COURT:  You don't have the -- I'm not saying

24   how I'm going to rule.  You don't have the stronger argument

25   on --

```
 1                 MR. WEXLER:  It's an open issue on issue
 2      preclusion.
 3                 THE COURT:  I recognize it is.  And you're saying
 4      basically, don't rule on it, we don't have to appeal, which
 5      frankly, you have a right to, that's just fine.
 6                 But it would be one thing if it was just preserving
 7      the status quo.  But it's giving you what you want
 8      substantively as well.  And therefore, it is in a sense a
 9      mini-ruling on the merits.
10                 MR. WEXLER:  But the status --
11                 THE COURT:  And unless -- the concern I have,
12      fairness, it's just about fairness.
13                 MR. WEXLER:  Your Honor, the status quo in a
14      Hatch-Waxman case contemplates the presence of a 30 month
15      stay until the litigation is resolved on the merits.  And
16      what we're saying is that --
17                 THE COURT:  If you're saying that, that's fine.
18      But then there will be no stay.
19                 So if you want a stay, work something out with each
20      other.
21                 MS. BLOODWORTH:  And, Your Honor, may I give your
22      clerk the Pharmacia case?
23                 THE COURT:  Yes, you may.
24                 I'm not saying there will be no 30.  The 30 month
25      stay goes until I rule.  But I'm just not going to sit here.
```

1            MR. WEXLER:  I'm sorry, Your Honor, may we give you

2       the Upjohn --

3            THE COURT:  Yes, you may.

4            ( After a brief recess court resumed ).

5            THE CLERK:  All rise.

6            THE COURT:  You may all be seated.

7            Is there any agreement of any kind reached to

8       render it unnecessary to continue?

9            MR. WEXLER:  Your Honor, we couldn't come up with a

10      proposal that would be fair and we asked Mylan and Mylan --

11           THE COURT:  No idea?

12           MR. WEXLER:  -- had no idea either, so --

13           THE COURT:  Okay.  Fair enough.

14           MR. WEXLER:  One other thing we had raised briefly

15      was this concept that if the Federal Circuit were to reverse

16      and this case were to be dismissed, and Mylan hypothetically

17      in their scenario does launch, then we have to rush back to

18      the Court to reopen the judgment, file a preliminary

19      injunction and seek damages.  So that would be the structure

20      of the case at that moment.

21           THE COURT:  They would be launching at risk, I

22      suppose, is what you're saying, to whatever you might or

23      might not get by way of relief.

24           MR. WEXLER:  Once the Federal Circuit reverses and

25      the patent -- yes, once the Federal Circuit reverses and the

1    patent is held valid, then we would have to come back to

2    this court, because this court premised its decision on the

3    reverse of the collateral estoppel, a decision that has been

4    reversed.  We would have to come back, reopen a judgment,

5    seek an injunction, emergency injunction and damages.  I

6    proposed hypothetically would they be willing to stipulate,

7    in that case they would be willing to stipulate to the

8    injunction and damages if the Federal Circuit reversed.

9    Obviously, we didn't reach agreement on that.

10        THE COURT:  But you're both trying to figure out

11   -- that's what I thought you might be able to work out

12   together.  Because you've got the benefit of a 30 month stay

13   right now on a patent that's been held invalid.  And you're

14   holding them off the market on a patent that's invalid right

15   now.

16        And they have the issue of whether or not what

17   would be the sequellae if the circuit were to reverse.  So

18   both of you have a degree of uncertainty about your

19   positions, which is why I thought you might be able to forge

20   something, being brilliant creative legal minds.  That was

21   the thought in my mind.

22        MR. WEXLER:  And, Your Honor, I think the 30 month

23   stay contemplates the difficulty of that situation

24   because --

25        THE COURT:  Actually, the 30 month stay really

1    couldn't.  This is a rather unique circumstance.  I know

2    you're a wonderful advocate, but trust me, I've read

3    everything there is to read about this and that stay, and

4    this isn't what they were thinking --

5              MR. WEXLER:  Thank you, Your Honor.

6              THE COURT:    -- they are balancing various rights

7    and opportunities, as well they should, and that's their job

8    and they're congress, and our job is to enforce their law

9    and that's what we did.

10             MR. WEXLER:  But the 30 month stay wasn't

11   dissipated or waived on a different ANDA filing, so the 30

12   month stay is specific to the ANDA, to litigate it on the

13   merits and that is the only reason I --

14             THE COURT:  But it is accusing them of infringing a

15   patent which right now is invalid.

16             MS. BLOODWORTH:  Yes, Your Honor.

17             MR. WEXLER:  And in our final judgment, Your Honor,

18   we have a de novo review of the issues that are on appeal.

19   And one other thing --

20             THE COURT:  I understand your position.

21             Let me ask you, why doesn't a lot of the language

22   in the Roche case that you gave to me come back to bite you?

23             MR. WEXLER:  Because, if Your Honor looks at the

24   next, the next piece of paper that I gave you, in the Roche

25   case the -- in the Roche case, if you look at the dates on

1          page 1376, Your Honor will see that the Federal Circuit

2          affirmance was in 2007.  It was April 2007.  So the Federal

3          Circuit affirmed the first judgment in April 2007.  And the

4          District Court then didn't hear summary judgment until after

5          that.

6                    THE COURT:  Wait.  I'm not following you.  You're

7          saying --

8                    MR. WEXLER:  Oh --

9                    THE COURT:   -- which page are you referring me to?

10                   MR. WEXLER:  If Your Honor, I'll --

11                   THE COURT:  No, just tell me.  Which --

12                   MR. WEXLER:  Okay.  The page 1376 of the Federal

13         Circuit's opinion --

14                   THE COURT:  Right.

15                   MR. WEXLER:   -- and if we look at the first

16         column, the last sentence of the first column.  It's the

17         first full paragraph on 1376.

18                   THE COURT:  Yes.

19                   MR. WEXLER:  If -- you'll see there's a reference

20         there to, and we affirm without opinion, 2007.  So -- and

21         that is, that's discussing the first action, and there was

22         an affirmance of the first action in -- and it was April

23         2007.  The Lexis one will show the date, it was April 2007.

24                   Now, if we continue through the opinion and we --

25         and we look at the second column, where they talk about the

1      District Court's summary judgment motion, we see that was

2      September 11, 2007.  So it was many, many months after the

3      Federal Circuit's affirmance on appeal.

4           Now, I saw those dates and I pulled the underlying

5      District Court ruling.  And those two pieces of paper I

6      showed you, I gave you, if Your Honor still has them.

7      Document 37 states, this case has been stayed while the

8      validity of the patent was litigated in this court and the

9      Federal Circuit.  So in other words, the procedural posture

10     of this case was that there was a District Court finding,

11     there was an appeal, the District Court stayed the

12     proceedings pending the Federal Circuit appeal.  The moment

13     the Federal Circuit ruled, the parties got together for a

14     status conference, and we can see that in the first piece of

15     paper I gave you, document number 37.  And so they came to

16     the court right after the Federal Circuit ruling, they told

17     the Federal Circuit about the affirmance.  And then in the

18     next piece of paper I gave you, 48, the --

19          THE COURT:  But they affirmed the decision that the

20     patent was not invalid, so they upheld the patent.

21          MR. WEXLER:  They upheld the patent.  So the stay,

22     the patent was still valid while the stay was in effect.

23          THE COURT:  The problem, the concern I have about

24     fairness here --

25          MR. WEXLER:  Yes.

1            THE COURT:  -- is the fairness of continuing a stay

2       based on a patent that's been held invalid.  And my other

3       concern, the corollary concern, is fairness of issue

4       preclusion, if there should be a reversal.  And so those are

5       the two fairness concepts that I'm trying to balance in what

6       I do.

7            MR. WEXLER:  And I appreciate.

8            MS. BLOODWORTH:  And Your Honor --

9            MR. WEXLER:  If I may just address those two

10      points.

11           The first is that, and I appreciate that this is a

12      difficult situation we're in.  And the first thing --

13           THE COURT:  Which is why I thought that you might

14      have a little more flexibility in trying to work something

15      out.

16           MR. WEXLER:  The problem, Your Honor, is that for

17      us to agree to pay them pending a decision by the Federal

18      Circuit raises a host of issues that are, number one,

19      complicated; and number two, you know, a transfer of money

20      to them is not something we would do lightly.

21           THE COURT:  I'm not saying anybody should do

22      anything lightly.  I just thought that you might have tried

23      to -- both sides might have been able to quickly, maybe not

24      so quickly, to work out something that made sense in this

25      posture.

1           MR. WEXLER:  In the half an hour that we had we

2     couldn't think of something that would be satisfactory and

3     they weren't able think of something that satisfied --

4           THE COURT:  Clearly.  Which is fine.

5           MR. WEXLER:  Now, one thing, as an alternative, is

6     the question of this stay.

7           Judge Shwartz set up a schedule, and I don't know

8     if Your Honor has a copy, but we have a copy now.  But the

9     structure of the schedule that the parties agreed to, it

10    hasn't been entered yet by Judge Shwartz, so I apologize if

11    I suggest that she entered it.

12          But the way, the structure of the schedule now is

13    basically we do contention, we just identify our contentions

14    through the period of about October, November.  So no real

15    heavy lifting on any discovery issues.  We identify our

16    contentions.

17          And then next year, at the beginning of the year,

18    we can start in with any discovery.  But presumably by then

19    the Federal Circuit will have ruled.

20          So the structure of the schedule right now postures

21    this case so that we will get a Federal Circuit ruling at a

22    time when we know contentions of the parties and that would

23    be a lot like the Roche case, where if we win, the Roche

24    case kicks in, where the court, as I mentioned, stayed

25    proceedings once the Federal Circuit --

1           THE COURT:  But in Roche they won, the patent was
2    held valid.  Right?  Now you're on the opposite side of
3    that --

4           MR. WEXLER:  But they stayed --

5           THE COURT:   -- the patent is invalid.  They stayed
6    with a valid patent.  So the 30 months seemed fair to the
7    judge who had that case.  The judge who had that case said
8    this patent's valid, so it seems fair to continue this.

9           MR. WEXLER:  Two things.  I'm not citing that case
10   for the 30 month stay principle.

11          The principle of that case is they stayed the case
12   pending the Federal Circuit, so that there was -- they
13   didn't apply collateral estoppel in that case to the
14   defendant.  Because if the Federal Circuit reversed, then
15   they would have been reopening the judgment and premising a
16   judgment on a decision that's been reversed.

17          I cited the Cima case where Judge Debevoise issued
18   a stay in a Hatch-Waxman case, and he weighed the 30 month
19   issues in that case, but they were a fact --

20          THE COURT:  I understand that.  But when I started
21   doing Hatch-Waxman work a long time ago, judges were
22   routinely taking the entire amount of time to decide these
23   cases, and it occurred to me that that was wrong.  That we
24   should proceed with a little greater but deliberate speed.
25   And I still took 12 months to decide a case that I should

1      have been able to decide in three months.  But I still took

2      12 months because the decision I initially came down with in

3      my first Organon decision was so novel at the time, no one

4      had come down with it yet, and so I thought, well, why does

5      this seem so novel?  I don't know.

6              So I took my time and I thought it through an

7      entire summer, and finally rendered a ruling in about 12

8      months, which struck me as a long time.  And thought, you

9      know, all the timbers were rattling, it was such a terrible

10     thing to do, six weeks later the circuit came down with the

11     exact same decision, albeit in another case.  So there

12     really wasn't a need to have gone through so much Sturm and

13     Drang to do it.  But we did.

14             MR. WEXLER:  And Your Honor, in this case where the

15     parties have proposed a schedule, and I would submit, Your

16     Honor, there's no greed in this case, as if you look at the

17     schedule we proposed, it actually wraps up before even the

18     end of the 30 month stay.  I have as example, it ends the

19     pretrial conference in the September time frame --

20             THE COURT:  Just understand what I'm thinking

21     about.  I'm back to what I told you I thought.  I'm striving

22     for fairness, fairness here.  So something that's fair to

23     both sides.  That's what I'm trying to see how to do.

24     Because both sides have legal principles that have an

25     element of fairness underlying them.  They have an argument

1           that they can't, even if they could get approval, they can't

2           get final approval, they can't go to market because the suit

3           is pending based on a patent that's been found invalid by

4           the court in Delaware. That's their argument as to why it's

5           unfair to them.

6                   Your argument as to why it's unfair to you is you

7           you don't want to be thrown completely out of court in the

8           event that the Federal Circuit overrules the finding of the

9           court of Delaware that found the patent invalid.

10                  Those are the two competing fairness concepts that

11          I'm working towards a resolution of.

12                  MR. WEXLER: And Your Honor --

13                  THE COURT: Let me ask you this. So your argument

14          as to why -- let me ask you, why are you not citing Roche

15          Palo Alto versus Apotex?

16                  MS. BLOODWORTH: Because we agree that it's

17          distinguishable. As a matter of fact, we were counsel in

18          that case for Allergan.

19                  THE COURT: And why is it distinguishable?

20                  MS. BLOODWORTH: It's distinguishable because there

21          was no patent that was held invalid during the case, there's

22          no collateral estoppel preclusion effect that took place on

23          the side of the patentee in the Roche v. Allergan case.

24                  THE COURT: But what about the alternate holding

25          that Judge Prost discusses starting at page -- hang on a

1       second, starting at Roman numeral IV of that case.

2               MS. BLOODWORTH:  Yes, Your Honor.  And I see in

3       Roman numeral IV, if you, you know, the case is again

4       factually distinguishable and I, again, don't -- and I

5       believe this is Mr. Wexler's point, if the case had been

6       affirmed on appeal already --

7               THE COURT:  It had already been affirmed.

8               MS. BLOODWORTH:  Yes.

9               And what plaintiffs -- what's the difference here

10      is that the finality of the judgment is not in question of

11      the District Court.  Plaintiffs are trying to use the

12      fairness exception to say that the Delaware District Court's

13      judgment isn't final.  The fact is we're harmed by this

14      stay, and by the filing of this action, like Your Honor

15      said, and thank you for that.

16              But the other, the flip side of it is if that

17      speculation, if the Federal Circuit reverses, and if Mylan

18      is launched in the meantime, the remedy to Boehringer is

19      damages, is monetary.  They don't have any harm.  They've

20      already agreed to your position --

21              THE COURT:  What I have to -- okay.  So what --

22      what would be the normal route?  Let's suppose I were to

23      agree with you on issue preclusion and the Federal Circuit

24      reverses.

25              MS. BLOODWORTH:  Yes, Your Honor.

1                THE COURT:  Then what is fair, what are

2    Boehringer's options fairly to do?

3                MS. BLOODWORTH:  Boehringer's option at that point

4    would be the same option that any other patent holder had in

5    any patent infringement case.  They can bring a suit if

6    Mylan has launched for an injunction, for damages and/or

7    they can bring an action in Delaware to have the .75 ANDA

8    action assumed in the judgment, in the reversal judgment.

9                THE COURT:  What does it mean to say to have it

10   assumed in?

11               MS. BLOODWORTH:  If we agree to transfer the case.

12               THE COURT:  Yes, you're going to Delaware no matter

13   what.  I'm searching for fairness.

14               MS. BLOODWORTH:  Yes.

15               And so in fairness what they have, they're in no

16   different position if Mylan hasn't launched, with or without

17   the stay -- with or without the stay.  Whether this case is

18   dismissed or not, Mylan hasn't launched.  They're in the

19   same place.

20               If Mylan has launched, then they have the right to

21   potentially get money damages and monetary damages aren't

22   harm.  They can be compensated for whatever loss they may

23   have.  And they have already agreed to generic competition.

24   Mylan is not going to be the only person selling a .75

25   milligram generic gramusol, the tablet, this would be a

1       patent case like any other patent which runs its typical
2       route while there's a product in the marketing.  It's taking
3       product, market share in the product on the market and the
4       patentee goes into the court and gets an injunction and asks
5       for monetary damages.
6               MR. WEXLER:  So Your Honor, under this
7       hypothetical, what, if the court dismisses, what they're
8       suggesting, we have to come back to this court --
9               THE COURT:  Not in this Court.  You're going to
10      Delaware.
11              MR. WEXLER:  Well, I mean if this suit is filed in
12      this court, and the court dismisses under their
13      hypothetical --
14              THE COURT:  What I'm considering, and I'll take
15      both of your comments on this, is a dismissal and transfer.
16      Okay?  Dismissal, and in the alternative, transfer.
17              And the dismissal of that is without prejudice to
18      your -- to the right of Boehringer, if the Federal Circuit
19      overrules the District Court in Delaware, to petition the
20      court in Delaware for any appropriate relief based on
21      anything in the Federal Circuit's ruling that they deem
22      appropriate to seek appropriate relief from Delaware on.
23      That's the concept I'm thinking about.
24              MR. WEXLER:  So under that concept then we would be
25      appealing the Court's dismissal to the Federal Circuit.

JOHN KEVIN STONE, CSR

1                THE COURT:  You can do whatever you want.

2                MR. WEXLER:  I'm just asking how it would play --

3                THE COURT:  I'm not sure how you can appeal.  It's

4        a dismissal without prejudice, so you'll have to decide

5        whether you can appeal or not under those circumstances.

6                MR. WEXLER:  So in terms of the ramification --

7        see, again, if we don't appeal we have the grotesque result

8        of a final judgment of dismissal.

9                THE COURT:  You can appeal -- I don't know whether

10       they'll take your appeal under those circumstances.  Because

11       if I were they, I would say, well, if we were to reverse,

12       then they have the right to go to the Delaware District

13       Court and seek any appropriate relief there in the first

14       instance.  Why don't we, the Federal Circuit, wait and see

15       what the Delaware court does with respect to that.  But they

16       could decide, I mean I'm just saying that's what I would do.

17               MR. WEXLER:  The --

18               MS. BLOODWORTH:  And Your Honor --

19               MR. WEXLER:  -- as Wright and Miller explains in

20       their treatise --

21               THE COURT:  I know, you say that's grotesque.

22               MR. WEXLER:  I'm -- no, I'm saying they posit that

23       in a complex settlement, where you don't -- dismissal of the

24       collateral estoppel, and you forfeit your rights to the

25       challenge and the collateral estoppel, even if the judgment

1      is so, we would have to file an appeal to protect our

2      rights.

3            THE COURT:  You can file anything you want.

4      Obviously.  So I'm just saying whatever, you can file

5      whatever you want.

6            MR. WEXLER:  So --

7            THE COURT:  I'm just asking you, both of you,

8      that's the scenario, I've come up with as a way to be as

9      fair as possible to both sides in this matter.

10           MR. WEXLER:  Yes, Your Honor --

11           MS. BLOODWORTH:  And, Your Honor, if I may, in

12     answer to Mr. Wexler, Mr. Wexler addressed the question of

13     whether Hatch-Waxman would require a final judgment --

14           THE COURT:  Final judgment --

15           MS. BLOODWORTH:  -- so if your order was to

16     dismiss based upon colattral or res judicata --

17           THE COURT:  Isn't dismissal without prejudice a

18     final judgment?

19           MS. BLOODWORTH:  Yes, Your Honor.  That would be

20     our argument for sure.  We would definitely argue that would

21     be final.  We would be before the FDA most likely on that.

22     But again, that would be okay with us.

23           But really, the point here is that while Mr. -- you

24     know, while Boehringer's group has the right to go into

25     Delaware and get a remedy, Mylan doesn't have any remedy.

1    If this case is not dismissed, we don't have any remedy.  We

2    will be precluded from getting FDA approval by this action.

3    We don't have any monetary damages that we can resort to.

4    No one would be able to -- you know, is obligated to

5    compensate Mylan in any way.  For -- we would essentially

6    have defended the same patent twice in two different courts,

7    and that's the very point and purpose of Rule 12.

8        And as for their concern -- and again, if I can

9    back up a little bit to some of the points we were

10   discussing with Mr. Wexler, one of the key things that this

11   motion to stay is requesting is really an abbreviation or a

12   hypothetical, you know, sort of a suspension of the finality

13   of the Delaware judgment, and that's exactly what the

14   Federal Circuit denied in the Pharmacia case, which was

15   another Hatch-Waxman case, and they said, and I quote from

16   page 13 -- 1301, "Upjohn next argues that the District Court

17   should have stayed the proceedings pending the resolution of

18   its motion in Mobil" --

19       THE COURT:  I'm still finding the page.

20       MS. BLOODWORTH:  Sure.  It's in page 9 of the

21   WestLaw printout.

22       THE COURT:  Yes.  I'm there.

23       MS. BLOODWORTH:  The first full paragraph on the

24   right hand column.

25       THE COURT:  Got it.

 1          MS. BLOODWORTH:  And it says, "Upjohn next argues
 2     the District Court should have stayed the proceedings
 3     pending a resolution of its motion," and then it goes on,
 4     "furthermore they requested consolidation of these
 5     arguments.  Upjohn in effect disputes the finality of the
 6     Mobile judgment and essentially the compensability of its
 7     applicability for collateral estoppel purposes.  We disagree
 8     with Upjohn's arguments."  These very arguments that are
 9     being made here today on collateral estoppel and their
10     motion to stay.  It's on all fours with what the Federal
11     Circuit already held in the Pharmacia case.

12          THE COURT:  Well, it talks about possible appeal in
13     that.

14          MS. BLOODWORTH:  And that case was still on
15     judgment as a matter of law.  So the District Court judgment
16     was a jury verdict.  But then they had filed post-trial
17     motions on it, and those post-trial motions at the time that
18     the Northern District -- at the time of the Pharmacia court,
19     District Court entered judgment, the post-trial motions were
20     still pending.

21          MR. WEXLER:  But Your Honor --

22          MS. BLOODWORTH:  So the very point is that this is
23     even -- this goes to, is even more applicable here, and the
24     court goes on to explain this.  Where the finalality, where
25     the judgment then goes up on appeal.  What they held was an

```
 1     even broader rule of collateral estoppel, is that the final
 2     judgment is final despite the pendency of the post-trial
 3     motions and despite the fact of appeal.
 4              MR. WEXLER:  Your Honor --
 5              THE COURT:  Mr. Wexler, you'll have your chance --
 6              MS. BLOODWORTH:  So the Cima case was a case that
 7     didn't involve issue preclusion.  State doesn't --
 8              THE COURT:  And the Cima case is another District
 9     Court --
10              MS. BLOODWORTH:  -- but the Federal Court here
11     addressed if there is an earlier decision that finds a
12     patent invalid for obviousness is it precluded, and they
13     said yes.
14              THE COURT:  What is the significance then in the
15     very last Supreme Court quote in the Roche case that says,
16     that refers to an unappealed judgment?
17              In the very last page, page 1381 of Roche Palo Alto
18     versus Apotex they quote, as the Supreme Court explained,
19     quote, "Nor are the res judicata consequences of a final
20     unappealed judgment on the merits altered by the fact -- by
21     the fact that the judgment may have been wrong or rested on
22     a legal principle subsequently overruled in another --
23              MS. BLOODWORTH:  That's a different -- they're
24     talking about how the SPR --
25              THE COURT:  I understand that.  But what is the
```

1    significance of using the word, unappealed, in that court,

2    out of the Federated Department Store case?

3              MS. BLOODWORTH:  I think what they're saying is in

4    that case there was no appeal to the judgment, it wasn't an

5    appealable judgment.  And in Pharmacia the judgment was

6    appealable --

7              THE COURT:  So -- so we have an appeal pending

8    situation?

9              MS. BLOODWORTH:  Which is what was happening in

10   Pharmacia.  Correct.

11             THE COURT:  I understand.

12             MR. WEXLER:  No --

13             THE COURT:  Excuse me, Mr. Wexler, what did you

14   want to say?

15             MR. WEXLER:  I'm saying in Pharmacia it wasn't

16   pending.  You emphasized the word possible appeal, so it's

17   incorrect to say the appeal was pending.

18             MS. BLOODWORTH:  It's actually not.  Because while

19   this was being decided, the parties did appeal the case.

20   And if you look at page, the bottom of page 10, the bottom

21   right-hand side, the court actually points to the fact that

22   it was harmful that the collateral estoppel decision was

23   correct, and it was properly due, because if it hadn't, if

24   you hadn't collaterally estopped the parties, they would

25   have -- the ANDA filing would have then had to be waiting

1       for -- to receive final approval in the abbreivated drug
2       application until that case, the earlier case that received
3       a final decision, a final appealable decision. And the
4       court, especially, the court specifically held that is not
5       proper. The fact of an appeal, the appeal does not have any
6       effect on res judicata. It doesn't have an effect on the
7       finality of the judgment.

8           MR. WEXLER: Your Honor, if I may respond.
9           THE COURT: But if what -- but if there were to be
10      a reversal at the Federal Circuit, which then resulted in a
11      the Delaware -- on whatever ground, it could be, and no
12      point speculating, and the Delaware court as a result of
13      that were to change its judgment, then conceivably even
14      Judge -- even in the Roche versus Apotex case they talk
15      about the fact that there could be some rare exception, some
16      momentous change in important fundamental constitutional
17      rights is the quote that comes out of that case. Maybe it's
18      not even constitutional. That there could be important
19      fundamental rights that could be affected in this unusual
20      circumstance, which is why I'm searching for what's fair.
21      And it seems that what's fair is to allow -- is to
22      essentially transfer it, to the extent there are any further
23      proceedings in this case, transfer to Delaware with the
24      right to petition the court in Delaware for any appropriate
25      relief that they believe is just and proper following the

1    Federal Circuit's decision in the appeal of the District of

2    Delaware case.

3            MS. BLOODWORTH:  And that's why Mylan would be okay

4    with the transfer.

5            MR. WEXLER:  Your Honor --

6            THE COURT:  All right.

7            Or agree this 30 month stay doesn't, you know, gets

8    suspended.  That's what I was seeing if you two, if you

9    wanted to enter into some kind of agreement where perhaps

10   you would be relieved of the -- or you know, there could be

11   some exchange of rights in this interim period, since you

12   both face potential issues.  He faces the issue that you may

13   market, you may face the issue you may market under jeopardy

14   that you may be sued for damages if that patent was

15   overruled.  You both have downsides.  So do you want to take

16   sometime and try to see if you can hash out some kind of

17   fair compromise here?

18           MR. WEXLER:  And Your Honor --

19           THE COURT:  That recognizes the fairness to both?

20           MS. BLOODWORTH:  And again, the problem is we don't

21   have any remedy other than -- I mean we only have the remedy

22   of asking this court to dismiss this action.  You know,

23   aside from your -- the scenario you just laid out, we don't

24   have any right to go after Boehringer for money damages if

25   we don't work out an agreement.  Boehringer always has the

```
1       right to come after Mylan for damages if we ever launch a

2       product under duress.  If --

3                    MR. WEXLER:  Your Honor, -- I'm sorry.

4                    THE COURT:  Go ahead, Mr. Wexler.

5                    MR. WEXLER:  No, in terms of looking at this from

6       fairness, that situation where you're describing that the

7       case is dismissed, Mylan can launch, we have an appeal

8       pending with de novo review.  First, if there's a reversal,

9       we go and attack the judgment that was premised on a

10      collateral estoppel, non-final judgment for the purposes of

11      appeal, and then we have to go --

12                   THE COURT:  It is a final judgment.

13                   MR. WEXLER:  Not for the purposes of appeal.  I

14      mean --

15                   THE COURT:  It's a final judgment of a court.

16                   MR. WEXLER:  But it isn't final in the sense of,

17      for example, would the -- in other words, is it done -- you

18      know, as the appeals court is reviewing this --

19                   THE COURT:  Right.

20                   MR. WEXLER:  -- we all agree there's an exception.

21      Now the contours of that exception are not well-defined.

22                   THE COURT:  Right.

23                   MR. WEXLER:  But there's a reason that exception

24      exists, and the reason it exists is when you have a de novo

25      review it's --
```

1           THE COURT:  No, that's not the exception I'm

2      talking about.  The exception that's referred to in the case

3      you gave me, the Roche versus Apotex case, was talking about

4      a rare exception in cases involving quote, "momentous

5      changes in important fundamental constitutional rights,"

6      unquote.  That's the kind of -- they're not talking about

7      what you're talking about.  They're talking about a --

8           MR. WEXLER:  Roche --

9           THE COURT:   -- in fact, if you look at Judge

10     Prost's long, I think it's Judge Prost.  Yes.  She says in,

11     basically halfway through the second column on page 1380,

12     "the District Court however correctly recognized that there

13     is no change of law or fairness exception to prevent

14     application of a claim for claim preclusion," and then she

15     quotes Federated Department Stores, quote, "for us to

16     conclude under the facts of this case that the District

17     Court's order has become an instrument of wrong merely

18     because it rests on a since repudiated rational would be to

19     nullify the doctrine of res judicata under," quote, and then

20     she quotes a Fifth Circuit case, then she quotes an Eleventh

21     Circuit case, that basically say the general rule throughout

22     the nation is changes in the law after a final judgment do

23     not prevent the application of res judicata and collateral

24     estoppel, even though the ground on which the decision was

25     based were subsequently overruled.

```
 1                    MR. WEXLER:  Right.

 2                    THE COURT:  So -- but it's talking about being

 3          overruled in another case, and I understand this.  The

 4          distinction that I see, that's novel in what we're dealing

 5          with, is that it is in the Delaware case which rests on the

 6          the very same patent that is presently under appeal, but to

 7          give you 30 month stay benefits for a patent that's right

 8          now an invalid patent has fairness issues for the other

 9          side.

10                    MR. WEXLER:  And we're not asking for Your Honor to

11          simply establish a 30 month stay, we're going to sit back

12          and let it go in terms of the timing of this case right

13          now --

14                    THE COURT:  I'm saying -- you're not hearing, Mr.

15          Wexler.

16                    MR. WEXLER:  I understand.

17                    THE COURT:  You're an advocate.  You need to

18          listen --

19                    MR. WEXLER:  I'm listening.

20                    THE COURT:  -- and be a little creative.  Do you

21          want a little time to be creative?  I'll give it to you.

22                    MR. WEXLER:  Yes, Your Honor, we would.

23                    THE COURT:  Good.  Why don't you try to be a little

24          creative.

25                    MR. WEXLER:  Okay.
```

```
1                    THE COURT:   That's what I would do, if I were you.
2                    MR. WEXLER:   Okay.
3                    THE COURT:   All right.
4                    Try to work something out.  I'll take a little
5      recess.
6                    THE CLERK:   All rise.
7                    ( After a brief recess court resumed ).
8                    THE CLERK:   All rise.
9                    THE COURT:   You may all be seated.
10                   All right.  Here's my ruling.
11                   This action is dismissed on grounds of issue and/or
12     claim preclusion as a result of the Delaware District
13     Court's final judgment in Boehringer Ingelheim, etcetera,
14     versus Mylan Labs, Inc., invalidating the 812 patent.   The
15     Court recognizes that the Delaware District Court's decision
16     is presently on appeal to the Federal Circuit.  If the
17     Federal Circuit were to reverse the final judgment of patent
18     invalidity, the instant dismissal is without prejudice to
19     Boehringer's right to seek all appropriate injunctive and/or
20     monetary relief against Mylan in enforcement of its patent
21     rights.  Moreover, if the Federal Circuit were to reverse
22     the District Court in the Boehringer versus Mylan Labs case,
23     the instant dismissal is without prejudice to Boehringer's
24     right to seek any other appropriate relief from the effects
25     of issue preclusion, if it can demonstrate a rare exception
```

1    to that principle to the satisfaction of the Delaware

2    District Court.

3    By agreement of the parties, if there are any such

4    further proceedings in this case after a decision is issued

5    by the Federal Circuit, this case is hereby transferred to

6    the District of Delaware, with the recommendation that it be

7    assigned to and/or coordinated with the prior action in that

8    district regarding the same patent.

9    The Court recognizes the request for a stay pending

10    the Federal Circuit's decision, but finds that fundamental

11    fairness is better served by the outcome now reached.  While

12    Boehringer will have significant rights to sue for an

13    injunction and damages if the Federal Circuit were to

14    reverse the Delaware District Court's finding of patent

15    invalidity, the converse situation of continuing a 30 month

16    stay in support of a patent that has been declared invalid

17    is without any legal recourse for Mylan.  Therefore, the

18    balance of the equities favors the instant result.

19    I will give the court reporter the official name of

20    the Delaware case that I said "etcetera" in the first line,

21    so that he has it.  You can order it from him if you wish

22    it.

23    Is there anything further I can do for you?

24    MR. WEXLER:  No, Your Honor.

25    MS. BLOODWORTH:  No, Your Honor.  Thank you.

```
1                    THE COURT:   Okay.

2                    Thank you, counsel.

3                    EXTRA ATTORNEY:   Thank you, Your Honor.

4                    THE CLERK:   All rise.

5                    THE COURT:   Oh.   You can share these.

6                    MS. BLOODWORTH:   Thank you, Your Honor.

7                    THE COURT:   It's okay.

8                    ( Court adjourned ).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```